DAVID ADLER & SONS COMPANY, Appellant, vs. MAGLIO and others, Respondents.

*May 2—December 3, 1929.*

154

For the appellant there were briefs by *Lamfrom, Tighe, Engelhard & Peck,* attorneys, and *Leon B. Lamfrom,* of counsel, all of Milwaukee, and oral argument by *Leon B. Lamfrom* and *A. J. Engelhard.*

*Wm. F. Quick* of Milwaukee, for the respondents.

STEVENS, J.  The case presents questions of far-reaching importance which demand and have received mature and

deliberate consideration by the court,—questions which arise out of the modern development of industry, with its great aggregations of capital and large numbers of employees,—questions which did not arise in the days when the employer worked beside his men.

A study of the voluminous record satisfies the court that the findings of the trial court are amply sustained by the proof as to all facts material to a decision of the case.

The plaintiff had for many years been a large manufacturer of men's ready-made clothing. The defendants were employed in its factories in Milwaukee. Eighty per cent. of plaintiff's employees were women. Many of these employees had worked for plaintiff for periods varying from twenty to thirty years. For some years the relation of the union employees of the plaintiff had been regulated by contracts made with the Amalgamated Clothing Workers of America. The last of these contracts by its terms expired on April 30, 1928.

As early as January, 1928, the plaintiff had determined not to renew the contract with the unions, but to conduct its business as an open shop. It kept that decision secret. It realized that such a step would probably be followed by a controversy with organized labor. It prepared to meet such a struggle by contracting to have a part of its clothing manufactured elsewhere. It began a course of deliberate and systematic breaches of the contract then in existence, with the apparent purpose of inducing its employees to take some action that would throw upon them the onus of having precipitated this labor controversy.

Plaintiff dismantled one of its shops and shipped the machinery used therein to another city where it was used in manufacturing clothing. At the same time it led the three hundred men and women employed in this shop to believe that they would be given work again as soon as the slack season was over. The plaintiff discharged union cutters and shop foremen without just cause therefor. It refused

to rotate workmen or to attempt to equalize work among its employees, as it was required to do by its contract. It refused to arbitrate any of these matters of difference, all in direct violation of the provisions of this contract.

The employees became restive because of the refusal of the plaintiff to abide by the terms of its contract. Finally, after the officers of the union had tried in vain to secure redress from the plaintiff, a meeting of the employees was held on April 16, 1928. While the plaintiff had not given formal permission for the holding of the meeting, the fact that it was to be held was generally known throughout the shops and to the superintendents thereof, if not to the principal officers of the plaintiff. It was held during the slack season. Many employees had been laid off. Others were working part time. Some worked through the noon hour in order to complete necessary work before attending the meeting. The trial court found that the participation of employees in this meeting did not seriously affect the operations carried on in any of plaintiff's shops or cause appreciable inconvenience or damage to the plaintiff.

Plaintiff did not await the outcome of this meeting. It sought to make the meeting a justification for locking out all of its employees, regardless of whether they had participated in this meeting or not. It immediately notified the officials of the Amalgamated Clothing Workers of America in Chicago that the existing contract with the union was terminated upon, what the trial court found to be, "the sole and groundless claim that participation by some of the plaintiff's employees" in this meeting "constituted a 'walk-out' and 'a serious and substantial breach of the contract.' "

During the day on which this meeting was held the plaintiff prepared a form of contract of re-employment by which the employee was required to agree to work in an open shop and not to become a party to a strike or walk-out. When employees returned to work on the morning of

April 17, 1928, they found the shops locked. They were informed that they could not return to work unless they signed this new contract of employment. The payment of wages then due was postponed for one day in order that copies of this proposed contract might be presented to all employees then at work when they came to receive their pay.

These are among the facts established by the proof that lead to the conclusion that the plaintiff pursued a deliberate and consistent course of conduct which naturally led to the controversy with organized labor with its accompanying acts of violence which caused plaintiff to appeal to equity for protection.

The plaintiff had the undoubted right to determine that its business should be run as an open shop, just as the employees had undoubted right to refuse to sign the proposed contract and to insist upon their rights under the existing contract. But neither the plaintiff nor its employees had a right to resort to violence or unlawful means to secure the result desired by them.

The strike which followed the locking out of the employees was the natural result of the course of conduct pursued by the plaintiff. An examination of the record satisfies the court that it was a result which the plaintiff expected might follow its breach of the contract and the wrongful lockout of its employees. Otherwise it would not have made such careful and complete arrangements for conducting its manufacturing operations elsewhere than in Milwaukee,—the scene of the labor trouble here in question.

The fact that the plaintiff refused to resort to the peaceable means provided by its contract with the unions for settling these troubles with its employees shows that the plaintiff did not want peace and that it hoped to accomplish its purpose by precipitating a controversy with its former employees during the slack season so that they would be driven

to seek employment upon such terms as the plaintiff might offer, by the economic necessity which comes from unemployment, which in this case was caused in part at least by plaintiff's wrongful discharge and locking out of its employees.

Plaintiff pursued a course of conduct that precipitated a labor war. When the tide of battle seemed to be setting against it, the plaintiff sought to withdraw from the field to which it had deliberately gone and appealed to a court of equity for protection from the consequences that naturally flowed from the course of conduct which it had deliberately pursued.

A court of conscience will not extend its strong arm to protect one who has pursued such a course of conduct. It will leave such applicant for relief where it has deliberately chosen to place itself. "A court of equity will leave to his remedy at law—will refuse to interfere to grant relief to— one who, in the matter or transaction concerning which he seeks its aid, has been wanting in good faith, honesty, or righteous dealing. While in a proper case it acts upon the conscience of a defendant, to compel him to do that which is just and right, it repels from its precincts remediless the complainant who has been guilty of bad faith, fraud, or any unconscionable act in the transaction which forms the basis of his suit." *Michigan Pipe Co. v. Fremont D., P. L. & R. Co.* 111 Fed. 284, 287.

Had plaintiff exercised its legal right to determine that its business would be conducted as an open shop and at the same time refrained from breaking its contract and from wrongfully locking out its employees, a different question would have been presented. Had plaintiff not pursued a course of conduct naturally calculated, if not deliberately intended, to bring about the very conditions which led it to appeal to the courts, equity would entertain jurisdiction and exercise its extraordinary powers so far as essential to protect the rights of the plaintiff.

But the portals of equity are closed to those who come seeking relief from the consequences which naturally flow from deliberate wrongs committed by the applicant for relief. "A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity." *Deweese v. Reinhard,* 165 U. S. 386, 390, 17 Sup. Ct. 340, 341, 41 Lawy. Ed. 757, 758.

The decisions of this court deal with no similar situation, doubtless, to the honor of the state be it said, because both employers and organized labor in Wisconsin have generally so respected the rights of each other that very few controversies of this nature have been brought into the Wisconsin courts. But the case is ruled by well established principles of equity.

Tracing the history of the development of equity jurisprudence, we find "that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act *upon the conscience* of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the

maxim, He who comes into a court of equity must come with clean hands; and although not the source of any distinctive doctrines, it furnishes a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of remedies and remedial rights." Pomeroy, Eq. Jur. (4th ed.) § 398.

"Equity imperatively demands of suitors in its courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness, will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly 'within the law.' Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime or to constitute the basis of legal action. Under this maxim, any wilful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean." *Weegham v. Killefer,* 215 Fed. 168, 171.

"The principle that a plaintiff who asks affirmative relief must have clean hands before the court will entertain his plea is both ancient and universally accepted. . . . The general principle simply is that he who has been guilty of substantial misconduct 'in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties and arising out of the transaction,' shall not be afforded relief when he comes into court as an actor seeking to set the judicial machinery in motion." *Huntzicker v. Crocker,* 135 Wis. 38, 41–2, 115 N. W. 340.

In order to deny plaintiff relief in equity "the court must clearly see that it is the fruit of *his own* wrong, or relief from the consequences of *his own* unlawful act, which the plaintiff seeks." *Clemens v. Clemens,* 28 Wis. 637, 655.

The things from which plaintiff seeks relief are clearly the fruit of its own wrongful course of conduct. The whole controversy arises out of the disturbance of its relations with its former employees which was interfered with and finally completely severed because of the wrongful conduct of the plaintiff. Plaintiff started this controversy at a time when the employees were making no demands of any kind. When they were locked out, they asked no more than that the plaintiff do those things which it had contracted to do.

After the plaintiff had started the controversy it was difficult to so restrain the spirit of battle which pervades these economic struggles that occasional acts of violence would not be committed. But in all this voluminous record there is a surprisingly small number of such acts that are shown to have been committed by any of these defendants. A serious doubt may well arise upon the record whether any of the former employees of the plaintiff are responsible for all of the acts of which the plaintiff complains. The trial court found upon uncontroverted evidence that "these acts, though growing out of the controversy hereinbefore reviewed, were not instigated or authorized by the defendant unions or their representatives, but were committed by the individuals named upon their own initiative."

On the other hand, the evidence establishes without controversy that the wrongful acts of the plaintiff are chargeable directly to its managing officers. Even if the court could find that all of the acts of which the plaintiff complains were committed by the defendants, the doors of equity would still remain closed to the plaintiff, because such finding would do no more than to establish that both parties had been guilty of such conduct as to lead equity to deny relief to either.

This rule was applied in a recent Massachusetts case where a striking employee was denied relief from an illegal blacklist on the part of employers because he had participated in a strike conducted by unlawful means. "He has brought

these proceedings in a court of equity. Under the established maxim that 'He who comes into equity must come with clean hands,' the court will not lend its active aid to him if he has been in equal wrong with the defendants touching the transaction as to which relief is sought, but will leave him to his remedy at law." *Cornellier v. Haverhill Shoe Mfrs. Asso.* 221 Mass. 554, 561, 109 N. E. 643.

In this Massachusetts case the rule was applied to labor. But it applies with equal force to capital. Its strict application to all labor controversies ought to admonish both parties to these modern industrial struggles that, while they may conduct their own affairs in any way that does not violate the law, neither can be guilty of conduct that invades the rights of the other in regard to, or at all events connected with, the matter in litigation, so as to in some measure affect the equitable relations subsisting between the two parties without forfeiting all right to resort to the extraordinary powers of equity.

It is clear, as found by the trial court, that these "acts and breaches of contract on the part of the plaintiff . . . in an appreciable manner affect the equitable relations subsisting between the parties and are intimately connected with the other matters in issue herein." This finding brings the case within the rule stated in *Huntzicker v. Crocker,* 135 Wis. 38, 115 N. W. 340.

If, as plaintiff asserts, it has kept within its legal rights in all that it has attempted to accomplish, the fact remains that in so doing it has pursued a course of conduct which is such as will lead a court of equity to leave the plaintiff to the remedies which the law affords to it. Under the facts as established by this record the plaintiff is not entitled to relief in equity.

*By the Court.*—Judgment reversed, with directions to dismiss the complaint.