HUNTOON and wife, Respondents, v. CAPOZZA, Appellant.

*No. 55. Argued January 29, 1973.—Decided February 27, 1973.*
(Also reported in 204 N. W. 2d 649.)

448

450

For the appellant there was a brief by *Cotton, Rose & Rose* and *Terry W. Rose,* all of Kenosha, and oral argument by *Terry W. Rose.*

For the respondents there was a brief by *Phillips, Richards & Mayew,* attorneys, and *Donald E. Mayew* of counsel, all of Kenosha, and oral argument by *Donald E. Mayew.*

WILKIE, J. Two issues are presented on this appeal:

1. Were there substantial breaches of the land contract so as to warrant the specific performance of such contract?

2. Under the instant land contract, did the vendors have the duty to utilize the value of the 200 shares of stock (deposited with them) for contract payments, as a condition precedent to the commencement of an action for specific performance?

*Substantiality of breaches.*

The trial court found three specific breaches of the land contract by the purchaser: (1) A default in the monthly payment due on March 1, 1971, in the amount of $500; (2) a default under the terms of the land contract requiring the defendant to pay her share of the 1970 real estate taxes; (3) a default under the terms of the contract when her conduct resulted in the loss of the liquor license. We have no doubt that as a matter of law, under the circumstances of this case, the default in the payment due on March 1, 1971, was a material breach of the land contract substantial enough to justify equitable relief to the vendors. Although time is not ordinarily regarded as of the essence unless the contract so states or the circumstances indicate that such was the intent of the parties,[1] here both the con-

---

[1] *Kubnick v. Bohne* (1972), 56 Wis. 2d 527, 535, 202 N. W. 2d 400; *Buntrock v. Hoffman* (1922), 178 Wis. 5, 13, 189 N. W. 572.

tract and the circumstances indicate that intent. The contract contains an express provision making time of the essence. It also contains a provision for accelerating the payment due on the balance of the land contract in the event of a default of any payment. Then, too, the vendors' response to the vendee's failure here to make timely tender of the March 1, 1971, payment was a prompt and unequivocal notice of declaration that the entire unpaid balance was due and owing within ten days.

Defendant cites *Coxe v. Mid-America Ranch & Recreation Corp.*[2] for the proposition that a trial court might properly refuse to grant equitable relief to a vendor where the breach complained of is not substantial. *Coxe* was in this court at the demurrer stage and the case was returned to the trial court for "a complete factual determination," such determination being ordinarily a question of fact. In *Coxe* the condition allegedly breached was for the maintenance of fire insurance on the premises.

Although the vendee here also did not timely make her payment of the portion of the 1970 real estate taxes she had undertaken to pay under the land contract, we are not prepared to state on this record that such breach was material.

The breach of the contract provision requiring the vendee to keep the tavern license in good standing, which license was transferred to the vendee as part of the agreement, under the circumstances of the instant case is substantial as a matter of law and is further justification supporting the vendors' action for specific performance. As to the tavern license, the land contract contained the following clause:

"It is further agreed between the parties that should the purchaser be denied a Class B license for the sale of fermented malt beverages and liquor by the city of

[2] (1968), 40 Wis. 2d 591, 162 N. W. 2d 581.

Kenosha, the contract shall become null and void and all sums paid hereunder shall be immediately returned to the purchaser."

While it is undisputed that defendant was denied a tavern license on March 8, 1971, by the Kenosha common council, defendant contends a breach of contract may not be predicated upon such license denial because (1) this breach was not alleged in the complaint; (2) the license was not in the name of the vendors at the time the contract was executed; and (3) the issuance of a liquor license being a discretionary act of a city council, no property right may exist in such a license.

The reason the vendors did not allege the loss of the tavern license in their complaint is that at the time of the pleadings herein the state of the law was such that contractual provisions relating to liquor licenses were not recognized as valid. It was not until November 2, 1971, that this court recognized the validity of such provisions.[3] The instant trial court initially permitted evidence regarding the revoked tavern license at trial on December 28, 1971, over objection by defendant's counsel, to discover whether there existed any reason defendant might not be permitted to take advantage of equity's protection:

"*Mr. Mayew:* If it please the court, the defense in this case is being based on equitable grounds. The defendant is pleading equity and I believe in order for the defendant to plead equity the facts relating to other terms of the contract may properly be brought before the court in this type of action.

"*The Court:* That was my thought in my first ruling. I don't want to deny, however, to the defense of an opportunity to defend against anything and everything. Mr. Rose points out that he hasn't had any notice that this was going to be raised and isn't prepared to defend it now. I think it's proper and I think as a matter of

[3] *Sprecher v. Weston's Bar, Inc.* (1971), 52 Wis. 2d 677, 191 N. W. 2d 212.

fact we should take up everything that is a problem between these parties. I hesitate to adjourn this matter, but if it's necessary I will do so. Do you want an adjournment, Mr. Rose?"

Acknowledging counsel's objection, the trial court permitted evidence concerning the revoked tavern license pending a fuller briefing on the issue of its evidentiary value:

> "*The Court:* I assure you there will be no decision until you've had a chance to make any investigation and further brief or further argument you wish to make on the subject. Otherwise we simply are going to stop this and you're going to amend your complaint and we're coming back in two months from now and go through this all over again. That's the only reason I suggest that we proceed this way."

At the close of the trial, the court ordered the submission of briefs upon the issue of whether the tavern license revocation was properly before the court. It appears that not until the submission of these briefs was the trial court aware that this court recognized, in *Sprecher v. Weston's Bar, Inc.,* the validity of contractual provisions respecting tavern licenses.[4]

Sec. 263.28, Stats., gives a trial court great discretion as to both the admissibility of proof which is at variance with the pleadings and the amendment of such pleadings.[5] The determinative question is whether the adverse

---

[4] *Id.*

[5] Sec. 263.28, Stats., provides: "**Variances, materiality.** (1) No variance between the allegation in a pleading and the proof shall be deemed material unless it misleads the adverse party to his prejudice. Whenever it shall be proved to the satisfaction of the court that a party has been so misled, and in what respect he has been misled, the court may order the pleading amended upon such terms as may be just.

"(2) When the variance is not material, the fact shall be found in accordance with the evidence and the court may order an amendment without costs."

party is misled to his prejudice by such variant evidence.[6]

It does not appear necessary, however, to determine whether the trial court herein adequately assessed the prejudice to defendant which resulted from this proof variance. The reason lies in the fact that this evidence is admissible under the law of this state, to assist a court's evaluation of whether a particular party may properly take advantage of equity's protection.[7] The admission of this evidence was not, therefore, error.

Upon a fuller briefing of the tavern license issue, the trial court apparently amended the complaint, upon its own motion, to conform with the evidence adduced at trial. This is only inferable from the trial court's memorandum decision wherein it concluded the lost tavern license was a material breach of the land contract. It is well established that a trial court has great discretion to amend the pleadings.[8] This may be upon a trial court's own motion,[9] and such amendment may be granted after judgment.[10] We conclude, therefore, that the trial court properly amended the pleadings, albeit without formality, upon its own motion and after being advised of the *Sprecher Case.* In view of the trial court's permitting both parties to file briefs supporting their positions on this issue, we are satisfied that there was no abuse of discretion in allowing this pleading amendment.[11]

---

[6] See *Knowlton v. Bowron* (1859), 7 Wis. 425, 427 (*500, *502).

[7] See, e.g., *David Adler & Sons Co. v. Maglio* (1929), 200 Wis. 153, 158–162, 228 N. W. 123.

[8] See sec. 263.28, Stats., *supra,* footnote 5.

[9] *Neenah v. Krueger* (1932), 206 Wis. 473, 475, 240 N. W. 402.

[10] *Schneck v. Mutual Service Casualty Ins. Co.* (1963), 18 Wis. 2d 566, 119 N. W. 2d 342.

[11] *Johnson v. Chemical Supply Co.* (1968), 38 Wis. 2d 194, 207, 156 N. W. 2d 455: "It has been held, however, that it would be an abuse of discretion to permit an amendment which would unfairly deprive opposing counsel of timely opportunity to meet the issue created by the amendment."

Defendant also contends the tavern license revocation is not pertinent to the land contract because the vendors did not have their names upon the license and such license does not give rise to property rights therein. The latter contention was dealt with in the *Sprecher* decision wherein this court stated:

"This lease is susceptible of a reasonable interpretation that the lessee upon the termination of the lease would not seek to have the liquor license transferred or a new license issued. The effect of such an agreement is to give the owners of the property an edge in the securing of a liquor license for their building or keeping a license available for a new tenant who could qualify. We must assume the parties attempted to enter into an enforceable contract and a construction favoring enforceability should be adopted." [12]

Similarly enforceable is a contractual provision wherein one agrees to do nothing to jeopardize the existence of a liquor license. Such a contract in no way interferes with the "discretionary authority of the body authorized to grant liquor licenses." [13]

The fact that the vendors' names were not upon the license is of little note. It was undisputed by defendant that her predecessor to the license also received it from the vendors. William Huntoon testified that prior to Mrs. Capozza's purchase of the property he leased it (the property and the license) to Mr. Ulrich Heinen. This man's name was upon the license at the time defendant received it. The defendant argues this signifies the vendors have no property interest in the license which could be the subject of a contract and breach thereof.

Both the trial court and the Kenosha city clerk-treasurer stated that this mode of transferring a liquor license was a common, though not officially recognized,

[12] *Sprecher v. Weston's Bar, Inc., supra,* footnote 3, at page 680.
[13] *Id.*

practice in the city of Kenosha. The trial court commented upon this practice:

> "*Mr. Rose:* The contract says the vendees have the right, title and interest to this. The vendees have no right, title and interest to the license. Neither does Mr. Huntoon have any right, title or interest. The court is aware of that. It's a city right and they can grant it or deny it.
>
> "*The Court:* Except as a practical matter over the last thirty years the council wherever it's possible to do so has honored this leasehold problem where there was a license. Now, I grant you that there isn't anything in the statute that says they have to do so. Nevertheless I know, as I think that anybody that has worked in this field knows, that council has recognized that the license is something of value to a particular site or location. And while Mr. Huntoon would have no right to insist that it be turned back to him it couldn't be, it would have to be through council, yet nevertheless it's the nature of the privilege that has been respected for many years."

It is therefore clear from the record that these tavern licenses have been regarded and respected by the city of Kenosha as having a property interest therein. As in *Sprecher v. Weston's Bar, Inc.*, it must be "assume[d] the parties attempted to enter into an enforceable contract and a construction favoring enforceability should be adopted." [14] Herein it is undisputed that the names of the vendors were not upon the tavern license. Yet, the parties herein agreed to maintain such license in full legal status. While such agreement cannot affect the city licensing authority, the parties here could validly agree between themselves as to the ramifications of its revocation by the licensing authority.

The breach of this obligation to maintain the license in good standing was undoubtedly the breach of a substantial provision of that agreement. The vendee argues

[14] *Id.*

that the trial court abused its discretion in not permitting her to redeem only the back payments on the contract rather than permitting the vendors to accelerate the entire obligation, which, she asserts, amounts to a forfeiture of the property. It is well established in this jurisdiction that upon the breach of a land contract the vendor may elect to, among other remedies, sue for specific performance of such contract.[15] This remedy has traditionally not been regarded as a forfeiture but rather as an affirmance of the contract wherein

"[t]he vendor may recover only the purchase price plus his costs and disbursements. In the event the property sells for a price in excess of the contract price, the surplus belongs to the buyer, but if a deficiency results the purchaser is liable for the deficiency."[16]

Furthermore, the contention of the vendee here that her breach as to the late payment was unintentional and unsubstantial overlooks the fact that there were two other breaches of contract: (1) failure to pay real estate taxes, and (2) loss of liquor license. These additional breaches on the part of the vendee preclude the protection equity often affords.[17]

### Sale of stock deposited with vendors.

The vendee's chief contention here involves the stock deposited by the vendee with the vendors. She argues that the vendors had a contractual duty to utilize the value of this collateral (200 shares of Lums, Incorporated, common stock) in the event, as occurred here, of a missed or late payment by the vendee.

[15] *Kallenbach v. Lake Publications, Inc.* (1966), 30 Wis. 2d 647, 142 N. W. 2d 212.

[16] *Id.* at page 651. *See also: Oconto Co. v. Bacon* (1923), 181 Wis. 538, 195 N. W. 412.

[17] *E.g., Martinson v. Brooks Equipment Leasing, Inc.* (1967), 36 Wis. 2d 209, 223, 152 N. W. 2d 849, 154 N. W. 2d 353.

The land contract's provision relating to this stock provides:

"The purchaser further agrees, as and for further security for the faithful carrying out of the terms and conditions of this contract to deposit with the vendors two hundred (200) shares of common stock in Lums, Incorporated which shares of stock have as the date of this contract a fair market value of not less than One Thousand Eight Hundred ($1800.00) Dollars. The said stock shall be returned to the purchaser when all of the terms, conditions, and covenants hereof have been fully performed by said purchaser. The said purchaser further agrees to see to it that said stock certificates are duly signed by the owner of record and to deliver said signed stock certificates not later than April 15, 1970."

In the construction of contractual provisions the prevailing idea is to glean the intent of the parties at the time such contract was executed.[18] Preferably this is done by resorting to the contract itself.[19] Occasionally this is insufficient and other indications of the meaning of contractual provisions are utilized.[20]

The express terms of the instant contract sufficiently point up the intent of the parties. Such intent is revealed in the contract's specifying the stock as "further security for the faithful carrying out of the terms and conditions of this contract." Webster probably gives the common understanding of the term "security:"

---

[18] *Aero Motive Sales Corp. v. Wausau Motor Parts Co.* (1950), 256 Wis. 586, 590, 42 N. W. 2d 141: ". . . Every agreement ought to receive a reasonable construction, and the true intent of the parties is to be carried into effect."

[19] *Greene v. Donner* (1929), 198 Wis. 122, 124, 223 N. W. 427: "Under the cardinal rule of construction, we are required to examine the language employed in this contract with a view of determining the intentions of the parties."

[20] *E.g., H. & R. Truck Leasing Corp. v. Allen* (1965), 26 Wis. 2d 158, 161, 131 N. W. 2d 912.

"2 a: something given, deposited, or pledged to make certain the fulfillment of an obligation (as the payment of a debt) . . ." [21]

To urge, as does defendant, that the vendors intended the word "security" to connote the conversion of the Lums, Incorporated, common stock into a late installment ignores three considerations: (1) The term "security" in both Webster and the instant contract connotes an assurance of the faithful performance of the *full contract* or obligation. Defendant's construction would leave the vendors entirely without such security, given the market remaining favorable, after two or three missed installment payments. This construction, therefore, ignores the purpose of security which, as indicated by Webster, assures full performance of an obligation and not partial performance.

(2) Defendant overlooks the point that the contract recites it is "further security for the faithful carrying out of the *terms* and *conditions* of this contract" (emphasis added). Thus, the contract itself does not state the security is to be utilized only for the condition relating to installment payments. The security assures the performance of *all* "terms and conditions," not one. Defendant's limiting construction would tie the stock deposit only into the installment payment provisions.

(3) Also overlooked by defendant's construction of the stock deposit provision is the concept that as a general rule important contractual provisions are not ordinarily left to implication. [22] In this situation, defendant's ar-

[21] Webster's, *Third New International Dictionary* (unabridged), pp. 2053, 2054.

[22] *Ratcliff v. Aspros* (1948), 254 Wis. 126, 129, 35 N. W. 2d 217: "In the instant case the provision for renewal is too indefinite and uncertain to be enforceable and it is void. In the lease before us no procedure is outlined, no method is indicated, and no standard is set up for determining the rental and terms of a new

gued-for construction would result in a significant alteration of the usual duties of vendor and purchaser.

*By the Court.*—Judgment affirmed.

lease. No resort to the settled rules for construction of the language of the covenant to renew can give meaning or substance to it. The courts cannot be called upon to write contracts or to supply omissions."