# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP788 |
| COMPLETE TITLE: | Christopher T. Beidel, <br>      Plaintiff-Appellant, <br>   v. <br> Sideline Software, Inc., <br>      Defendant-Respondent-Petitioner, <br> Michael C. Hall and Kevin C. Austin, <br>      Defendants. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 340 Wis. 2d 433, 811 N.W.2d 856
(Ct. App. 2012 – Published)
PDC NO: 2012 WI App 36

| | |
|---|---|
| OPINION FILED: | July 2, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 9, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | William W. Brash III |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ZIEGLER, ROGGENSACK, J.J., concur. (Opinion filed.) |
|   DISSENTED: | GABLEMAN, J., dissent.(Opinion filed.) |
|   NOT PARTICIPATING: | PROSSER, J., did not participate. |

ATTORNEYS:

    For the defendant-respondent-petitioner, there were briefs by *Kim Grimmer* and *Travis J. West* and *Solheim Billing & Grimmer*, *S.C.*, Madison, with oral argument by *Travis J. West*.

    For the plaintfiff-appellant, there was a brief filed by *Michael J. Aprahamian*, *Michael A. Bowen*, *Brian P. Keenan*, and *Foley & Lardner LLP*, Milwaukee, with oral argument by *Michael J. Aprahamian*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP788
(L.C. No. 2009CV5862)

STATE OF WISCONSIN    :    IN SUPREME COURT

**Christopher T. Beidel,**

      **Plaintiff-Appellant**

  **v.**

**Sideline Software, Inc.,**

      **Defendant-Respondent-Petitioner,**

**Michael C. Hall and Kevin C. Austin,**

      **Defendants.**

**FILED**

**JUL 2, 2013**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 N. PATRICK CROOKS, J. We review a published court of appeals decision[1] involving a dispute over the amount of money due to a shareholder for his shares in Sideline Software, Inc. (Sideline), a company that serves the fantasy football league market with an online league-management program. Because we agree that the balancing of the equities required in a specific performance claim did not occur and summary judgment was

---

[1] Beidel v. Sideline Software, Inc., 2012 WI App 36, 340 Wis. 2d 433, 811 N.W.2d 856.

improperly granted, we affirm the court of appeals' decision to reverse and remand for the circuit court to evaluate the claim under the principles governing specific performance, determining 1) whether specific performance is available as a remedy, 2) whether there was a substantial enough breach to warrant specific performance, 3) whether the equities lie on the plaintiff's or defendant's side, and 4) whether anything would make an order of specific performance unfair, unreasonable or impossible.

¶2 The minority shareholder, Christopher Beidel, sought specific performance of the Stock Repurchase Agreement[2] that he and Michael Hall, the majority shareholder, had signed. Beidel's claim rests on two provisions of the Agreement. One provision sets a stipulated price per share that is in effect for two years; if that price expires without a new stipulation, the share value is to be determined by an appraiser selected by Sideline. The other provision gives a shareholder whose employment is terminated without cause while a stipulated price is in effect the right to exercise a put option[3] to sell his

---

[2] In the Agreement, the parties stipulated that "[i]f a controversy arises concerning the right or obligation to purchase or sell any of the shares of Stock, such right or obligation shall be enforceable in a court of equity by a decree of specific performance." "When a contract specifies remedies available for breach of contract, the intention of the parties generally governs." Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, ¶37, 324 Wis. 2d 703, 783 N.W.2d 294.

[3] A put option is "[a]n option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." Black's Law Dictionary 1121 (7th ed. 1999).

shares at the stipulated price. The dispute: Sideline thinks it must pay only the appraised value for Beidel's shares, and Beidel thinks Sideline must pay the stipulated share price, which is some six times more.[4]

¶3 After it became clear that Sideline was planning to terminate him and was transitioning his duties to others while delaying the termination until the stipulated price expired, Beidel gave written notice that he was exercising his put option and demanding that 2,490 of his shares be purchased at the stipulated price of $1,600 per share, which had not yet expired. When Sideline refused to purchase Beidel's shares, Beidel brought a claim for specific performance, seeking to have the court order Sideline to purchase the shares at the stipulated price, for a total of nearly four million dollars.

¶4 At the heart of the equitable claim this case presents is the question of whether it was fair for Sideline to time a planned termination without cause to avoid paying Beidel $1,600 per share and instead choose to let the stipulated price expire before terminating him so that Sideline could instead pay only the fair market value of the shares. Beidel contends that Hall had explicitly told him in 2008 Sideline would terminate Beidel as soon as the stipulated purchase price expired; Beidel contends that Sideline essentially terminated him in 2008,

---

[4] The record does not disclose the precise difference between the two prices, but there is evidence that the difference is substantial; a purchase offer made to Sideline in early 2009 was for an amount that would have bought out the shareholders at $260 per share.

transitioning his duties to others and unfairly delaying the formal termination solely to avoid paying the stipulated purchase price then in effect.

¶5 Sideline does not dispute that the delay was due to a desire to avoid the stipulated share price; rather, it asserts that it was free to time the termination as it saw fit. Under Sideline's interpretation of the contract, refusing to pay Beidel the stipulated share price was not a breach of the Agreement because Beidel's option to sell the shares for that price was never triggered: no termination actually occurred until September 17, 2009. Sideline says Beidel is therefore entitled, under the applicable provision of the Agreement, only to "the fair market value of the [s]tock as determined by an appraiser selected by Sideline."

¶6 The court of appeals decision we review reversed a grant of summary judgment for Sideline on the grounds that "[t]he circuit court did not . . . consider the balancing of equities required in a case where a party seeks specific performance of a contract." Beidel v. Sideline Software, Inc., 2012 WI App 36, ¶16, 340 Wis. 2d 433, 811 N.W.2d 856. The court of appeals considered the fact that Beidel had sought specific performance and focused on "the special implications of that request for relief." Id., ¶14. The court of appeals concluded that although the circuit court's analysis correctly disposed of one aspect of Beidel's argument, "there is more" to evaluating a claim seeking specific performance. Id., ¶13.

¶7 The circuit court had granted Sideline's motion for summary judgment on the claim of specific performance, basing its holding on the conclusion that the claim could not rest on an allegation that Sideline had constructively terminated Beidel because a required element of constructive termination was undisputedly absent.[5] That is a correct statement of Wisconsin law concerning the test for constructive termination. This was not, however, a claim for wrongful termination, and, as the court of appeals rightly recognized, the claim that was made was never properly addressed.

¶8 The record indicates, too, that the circuit court voiced observations that would be relevant to the task of balancing the equities. As the court of appeals noted, the circuit court appeared somewhat reluctant to dismiss Beidel's claim on these facts; the circuit court stated that "[a] strong argument can be made that this scenario is so strong [that it resembles constructive termination]."

¶9 Besides that, it is potentially relevant to consider the circuit court's disposition of two other counts that were a part of this multi-count lawsuit,[6] claims that were against Hall

---

[5] At several points in the transcript, the circuit court appears to make reference to equitable considerations, but the basis for its ruling is clearly stated in terms of a constructive termination analysis.

[6] The amended complaint in this case, 09CV5862, lists three claims, characterized as follows: Count I: Specific Performance (as to Sideline Software, Inc.), Count II: Breach of Fiduciary Duty (as to Michael C. Hall) and Count III: Breach of Fiduciary Duty (as to Kevin C. Austin).

and another individual and arose from the same underlying facts. When those counts were before the circuit court for summary judgment disposition along with this one, the court declined to grant the defendants summary judgment for a notable reason: it found that "there are questions of fact with respect to [whether] they act[ed] in good faith" and whether they were acting in the best interest of the company or were "out to get Mr. Beidel." Those counts remained after this count was dismissed, and they proceeded to a jury trial after this count was dismissed.[7] While this appeal does not concern those claims, the motion hearing transcript in which the circuit court addressed all three counts clearly reflects the circuit court's conclusion that summary judgment was precluded as to Counts 2 and 3 by genuine issues of material fact that related to good faith among the parties and their dealings with each other. There is no evidence in the record that those concerns were addressed in the context of the specific performance claim, a claim that by definition turns on equitable considerations.

---

[7] Beidel moved the court of appeals to take judicial notice of the special verdict form from the jury trial. The court of appeals denied the motion, stating that "the verdict does not affect either the result of this appeal or the analysis of this opinion." Beidel, 340 Wis. 2d 433, ¶16 n.5. While reference was made in the briefs to this verdict, we are limited to the information in the record, which includes the summary judgment motion hearing transcript referenced above but not the jury verdict. See Jenkins v. Sabourin, 104 Wis. 2d 309, 313, 311 N.W.2d 600 (1981) (materials that are not a part of the record cannot be considered).

Such a claim should not be disposed of on summary judgment without addressing them.

¶10 Further, as the court of appeals observed, "[t]he rule that parties to a contract act in good faith is universal."[8] We have held that "[e]very contract implies good faith and fair dealing between the parties to it," and that mere "compliance in form, not in substance" is a breach of "the covenant of good faith that accompanies every contract."[9]

¶11 We therefore agree with the court of appeals that summary judgment was improperly granted in this case without the required balancing of the equities that are due to a specific performance claim and without a consideration of the potential application of the covenant of good faith and fair dealing. In order to make a prima facie case that Sideline was entitled to summary judgment, its motion would need to show a defense that would defeat Beidel's claim. That is, it must successfully attack the requirements for obtaining specific performance:

- that specific performance is available as a remedy[10];

---

[8] Beidel, 340 Wis. 2d 433, ¶15 (citing Restatement (Second) of Contracts § 205 (1981)).

[9] Chayka v. Santini, 47 Wis. 2d 102, 107 & n.7, 176 N.W.2d 561 (1970).

[10] Ash Park, 324 Wis. 2d 703, ¶37 (when a contract specifies remedies available for breach of contract, the intention of the parties generally governs). Otherwise "the primary criterion for the availability of specific performance has been the inadequacy of the legal remedy." 12 Joseph M. Perillo, Corbin on Contracts § 63.1 (rev. ed. 2012).

- that there has been a substantial enough breach to warrant specific performance[11]; and

- that the equities lie on [the plaintiff's] side,[12] and that nothing would make an order of specific performance unfair, unreasonable or impossible.[13]

In determining whether the requirements for specific performance have been met in this case, it will be necessary for the court to interpret and apply the provisions of the Stock Repurchase Agreement, with special reference to Section 6, Termination of Employment without Cause, as well as Sections 8(b) and (c), which relate to valuation. In this case the analysis necessarily involves interpreting the contract and determining whether the undefined term "termination" is ambiguous, and if so, what the parties intended the term to mean. Extrinsic evidence may be needed in order to make the determination of the parties' intent.

¶12 Sideline's motion for summary judgment does not set forth such a defense, and therefore fails to make a prima facie

---

[11] Huntoon v. Capozza, 57 Wis. 2d 447, 452, 204 N.W.2d 649 (1973).

[12] Venisek v. Draski, 35 Wis. 2d 38, 51, 150 N.W.2d 347 (1967); Gaugert v. Duve, 2001 WI 83, ¶46, 244 Wis. 2d 691, 628 N.W.2d 861 (describing the circuit court's balancing process in that case thus: "The circuit court also concluded that as between the [plaintiffs] and the defendants the equities were perhaps equal due to the uniqueness of the property and the competing interests at stake" and explaining that the circuit court had concluded that one party's failure to take steps to preserve a remedy tipped the scales).

[13] Gaugert, 244 Wis. 2d 691, ¶47.

case.[14]  Accordingly, we affirm the court of appeals and remand for "the circuit court's determination where the bulk of the equities lie, including an evaluation of what the parties intended when they agreed to the stock re-purchase agreement, and whether it should grant specific performance as Beidel requested."  Beidel, 340 Wis. 2d 433, ¶16.  A circuit court may grant summary judgment to a party on remand as warranted after the equities have been balanced, recognizing the implications of the nature of a claim for specific performance and the well-established obligation of good faith and fair dealing.[15]

## I.  BACKGROUND

¶13 The case arises in the context of a deteriorating relationship between a majority shareholder and a minority shareholder.  We briefly set forth a description of the parties, their relationship and the terms of the contract at the center of this dispute.

¶14 Sideline began by selling a computer program for fantasy football league management; it later moved to online

---

[14] See Swatek v. County of Dane, 192 Wis. 2d 47, 61-62, 531 N.W.2d 45 (1995) (describing the summary judgment methodology of examining first whether a claim has been stated, then turning to whether a prima facie case was made by the movant, and if so, examining the opposing party's materials). The validity of the claim in this case, the first step of the summary judgment analysis, is not at issue.

[15] Super Valu Stores, Inc. v. D-Mart Food Stores, Inc., 146 Wis. 2d 568, 577, 431 N.W.2d 721 (Ct. App. 1988) (Wisconsin law does recognize that "[e]very contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties.") (citation omitted).

products for that same purpose. It was incorporated in 1998 by Hall and Beidel, who had been college friends. Though the distribution of the shares changed over the years, Hall was from the beginning the majority shareholder, and at the relevant time, Hall owned 2,505 shares (slightly over half) and Beidel owned 2,495 shares. In the course of expanding the business, the company purchased in 2001 a small company that had developed an online product. Its owner, Kevin Austin, possessed the kind of programming skills that such online products required; he was initially engaged as a consultant and ultimately was hired and granted options to purchase outstanding shares of the company. Austin and Beidel did not have a good relationship; the deterioration of that relationship appears to have played a significant role in Beidel's eventual departure from the company.

¶15 In 2004, Beidel and Hall signed a Stock Repurchase Agreement that was intended to "provide a means of assuring a market for the sale of their Stock in certain specified events." As relevant to this appeal, the Agreement contained the following provisions. It contained a stipulation that specific performance is the appropriate remedy for breach.[16] It contained a provision that if a shareholder (that is, Hall or Beidel) were fired without cause, Sideline would buy that shareholder's stock

---

[16] In the Agreement, the parties stipulated that "[i]f a controversy arises concerning the right or obligation to purchase or sell any of the shares of Stock, such right or obligation shall be enforceable in a court of equity by a decree of specific performance."

10

at an agreed price. The clause, section 6 of the Agreement, reads:

> Termination of Employment Without Cause; Shareholder's Put Option. Upon the termination of a Shareholder's employment with Sideline without cause (as defined in section 7(b) below), the terminated Shareholder shall have a continuing option to sell all or any part of the Stock owned by him, and upon exercise of such option, Sideline shall have the obligation to purchase all of Shareholder's Stock so elected for sale by such Shareholder, at the price and on the terms provided in sections 8 and 9 below. Provided, however, that such purchase and sale shall be subject to the restrictions and limitations set forth in section 11 hereof. The terminated Shareholder shall exercise such option by providing 30 day[s'] prior written notice to Sideline of his decision to sell his Stock.

(Emphasis added.) The referenced sections relevant here, sections 8(b) and 8(c), provided for a two-year expiration date and an alternative valuation:

> If no review of the Purchase Price is undertaken, the Purchase Price set forth in the prior year(s) shall continue in effect unless a period of 24 months expires from the last time in which the Shareholders and Sideline stipulated a Purchase Price.

> If the Purchase Price has not been stipulated within the 24 months prior to a Purchase Event, and a Purchase Event occurs, the Purchase Price shall be the fair market value of the Stock as determined by an appraiser selected by Sideline.

¶16 Pursuant to the Agreement, Beidel and Hall set the stock price over the years between 2004 and 2007. As the court of appeals explained:

> The last stipulated price was agreed to in a document signed by both Hall and Beidel, dated March 6, 2007. It provided for a per-share valuation of $1,600, and

11

thus expired twenty-four months later because Hall and Beidel never agreed on a new valuation.

Beidel, 340 Wis. 2d 433, ¶4.

¶17 Because there was no new agreed-upon valuation, the price stipulated to on March 6, 2007, was set to expire on March 6, 2009. In October 2008, Hall told Beidel of his intention to terminate Beidel. In December of 2008, the two met to discuss the transitioning of Beidel's duties prior to April of the following year. Following that meeting, the process of transitioning duties seemed to be underway in January of 2009. That month another company interested in purchasing Sideline made an offer to purchase. The offer contained an employment agreement and stock options for Hall, but none for Beidel. On January 20, Beidel submitted written notice to Hall that he was thereby exercising his put option under the Agreement with regard to 2,490 shares of Sideline stock. The notice asserted that he had already been "stripped . . . of [his] job responsibilities" and his employment had "already been terminated by Sideline." He demanded that Sideline purchase the stock at the stipulated price in accordance with the Agreement.

¶18 When Sideline refused, Beidel filed a claim against Sideline for specific performance.[17] Sideline moved for summary judgment. Sideline claimed that it was entitled to summary judgment because "Beidel was motivated to claim he was constructively discharged in order to increase his buy-out,"

---

[17] He also filed related claims against Hall and Austin individually.

12

because "there was no termination of Beidel prior to March 6, 2009," and because "Beidel cannot establish a single element of constructive discharge" to establish that events prior to March 6, 2009, constituted termination. The summary judgment motion described "Hall's right to postpone the termination, in order to avoid the stipulated price," as "a significant contract right that Hall and Sideline had under the Agreement." It acknowledges that Hall "was not motivated to coerce Beidel into resigning in advance of March 2009" and that Hall "was motivated" to keep him employed "until at least after the stipulated price expired." It states that "Hall had specifically represented to Beidel that he would have a job until at least then . . . ." It also acknowledges that Beidel's duties were documented for the purpose of "transitioning them to others." The motion for summary judgment does not contain any argument concerning the equitable considerations relevant to a claim of specific performance.

¶19 The circuit court for Milwaukee County, the Honorable John J. DiMotto presiding, initially granted partial summary judgment to Sideline as follows:

> The plaintiff may not proceed on the specific performance claim against Sideline . . . by claiming that he was constructively discharged. There is no genuine issue of material fact that one of the essential elements of a claim of constructive discharge, actual resignation by the employee, did not occur in this case. . . . The plaintiff will be permitted to proceed to trial on Count No. I, but he will be required to prove that he was actually discharged by Sideline Software Inc., without cause, prior to the expiration of the stipulated price.

13

¶20 Following a subsequent hearing, the Honorable William W. Brash, III, denied Beidel's motion for reconsideration and dismissed the amended complaint with prejudice as to Sideline, noting that Beidel did not contend that he was actually terminated by Sideline prior to March 7, 2009. A subsequent motion for reconsideration was denied.

¶21 As noted above, the circuit court denied summary judgment as to related claims because the court found genuine issues of material fact concerning the good faith dealings of the parties.

¶22 The court of appeals reversed the grant of summary judgment; Sideline petitioned for review, and this court granted review.

## II. SPECIFIC PERFORMANCE

¶23 The question presented by the claim is whether Beidel is entitled to specific performance of the repurchase of his shares at the stipulated price of $1,600 each after Sideline refused to honor Beidel's exercise of his put option under the agreement. We look to our case law on specific performance for the principles that govern a specific performance claim. There we see a series of determinations that a court is obligated to make and the showing a party must make to prevail in such a claim.

¶24 The threshold question is whether specific performance is available. In this case, as noted above, the parties agreed in advance that it would be. In the agreement, the parties stipulated that "[i]f a controversy arises concerning the right

14

or obligation to purchase or sell any of the shares of Stock, such right or obligation shall be enforceable in a court of equity by a decree of specific performance." We have stated that when a contract specifies remedies available for breach of contract, the intention of the parties generally governs. Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, ¶37, 324 Wis. 2d 703, 783 N.W.2d 294 (affirming grant of specific performance). Where there is not such an agreement in advance, "the primary criterion for the availability of specific performance has been the inadequacy of the legal remedy." 219 Corbin on Contracts § 63.1. "[T]he general rule defining the instances where specific performance will be granted may be stated as follows: where damages are an inadequate remedy and the nature of the contract is such that specific enforcement of it will not be impossible or involve too great practical difficulties . . . equity will grant a decree of specific performance." 25 Samuel Williston, A Treatise on the Law of Contracts § 67:1 (4th ed. 2002). "Specific performance . . . will not be ordered if damages would be adequate to protect the expectation interest of the injured party." Restatement (Second) of Contracts § 359(1) (1981). See also Negus v. Madison Gas & Elec. Co., 112 Wis. 2d 52, 64, 331 N.W.2d 658, 665 (Ct. App. 1983) (holding that specific performance was unavailable because statute limits plaintiff to particular remedies: "Because Negus must pursue a statutory remedy available to him, the trial court erred in concluding

15

that specific performance was an available remedy. The order granting specific performance therefore must be reversed.").

¶25 After the threshold determination is made that specific performance is available, the analysis proceeds with a series of questions.

¶26 First, is there a substantial enough breach to warrant specific performance? In a case involving a contract, this necessarily requires the court to interpret the terms of the contract. The Restatement (Second) of Contracts describes the relationship of a breach and a claim of specific performance: "[Specific performance] is seldom granted unless there has been a breach of contract, either by non-performance or by repudiation." Restatement (Second) of Contracts § 357 cmt. a (1981).[18] In the context of a land contract, Huntoon v. Capozza refined the question further to weigh the significance of the alleged breach. The court focused its analysis on whether there were breaches "substantial enough" to warrant specific performance. Huntoon v. Capozza, 57 Wis. 2d 447, 452, 204 N.W.2d 649 (1973). Huntoon concerned a contract between a seller and buyer of a bar. The seller filed a claim for specific performance seeking the full balance of the purchase price and other costs after the buyer defaulted on the payments following a fire at the property. In addressing the claim, the

---

[18] It also acknowledges the possibility of seeking specific performance prior to a breach: "In unusual circumstances, however, it may be granted where there is merely a threatened breach." Restatement (Second) of Contracts § 357 cmt. a (1981).

court differentiated between various claimed breaches on the basis of whether they were "substantial enough to justify equitable relief to the vendors." Id. With respect to one claim, the failure of the buyer to pay an agreed-upon portion of the real estate taxes, the court said, "[W]e are not prepared to state on this record that such breach was material." Id. at 453. The other two claimed breaches, failure to make the monthly payment on time and failure to maintain the establishment's tavern license in good standing, were, the court found, "substantial enough to justify equitable relief to the vendors." Id. at 452. It is apparent from this distinction that absent the "substantial enough" breach, equitable relief is not justified.

¶27 In determining whether a substantial enough breach occurred, it will be appropriate to consider, as the court of appeals discussed, the covenant of good faith and fair dealing. As this court has observed, "Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." Chayka v. Santini, 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561 (1970). The Chayka case illustrates the common disfavor for following the letter but not the spirit of an agreement,[19] and in that case, it was deemed a

---

[19] See, e.g., Mendelson v. Del. River & Bay Auth., 56 F. Supp. 2d 436, 438 (D. Del. 1999) (rejecting a Maryland jurisdictional challenge that "look[ed] only to the letter of its contract, ignoring the spirit of the agreement" where the contract stated that the product would be shipped to Virginia but the manufacturer knew that the specially manufactured item was intended for installation in Maryland).

17

violation of the covenant of good faith and fair dealing to do
so.  What had happened in Chayka has been concisely summarized
this way:

> In Chayka, a husband and wife contracted to execute
> joint and reciprocal wills, which, upon one party's
> death, would leave all property to the other and, upon
> the survivor's death, would leave all property owned
> by the survivor to another relative. After the
> husband's death, the wife remarried and, shortly
> thereafter, conveyed virtually all of her property to
> her new husband (or, in some instances, to herself and
> her husband in joint tenancy). On the wife's death,
> her estate sought to overturn the conveyances.
> Resisting the challenge, the second husband argued
> that the will contract had been fully performed
> because a will with all of the agreed-upon terms had
> been executed (and fully performed, in that the wife
> did leave the property that remained to the
> relative).[20]

The Chayka court did not accept the second husband's argument
that the contract had been complied with, as the "property that
remained" had indeed been left to the other relative:

> This, as another court has well stated it to be, is "a
> mere play upon words."  What she in fact has done has
> stripped nearly all of the flesh from the bones,
> leaving only a skeleton for testamentary disposition
> to [the relative who was to receive the property].
> This is a compliance in form, not in substance, that
> breaches the covenant of good faith that accompanies
> every contract, by accomplishing exactly what the
> agreement of the parties sought to prevent.

Chayka, 47 Wis. 2d at 107.

---

[20] Foseid v. State Bank of Cross Plains, 197 Wis. 2d 772,
795, 541 N.W.2d 203 (Ct. App. 1995) (citations omitted).

¶28 The court of appeals in Foseid acknowledged what was implicit in Chayka's holding——that "accomplishing exactly what the agreement of the parties sought to prevent" constituted an independent breach even if there was no other technical breach alleged. "[W]e do not consider that reference as a holding that violation of the implied promise of good-faith dealing may not be considered independent of any breach (or lack of breach) of the underlying contract. Indeed, such a holding would run contrary to the supreme court's decision in [Chayka]." Foseid v. State Bank of Cross Plains, 197 Wis. 2d 772, 795, 541 N.W.2d 203 (Ct. App. 1995)(citations omitted).

¶29 A party may not, however, employ the good faith and fair dealing covenant to undo express terms of an agreement. Reliance on the covenant of good faith and fair dealing did not avail a franchisee who complained that "even if [the franchisor's] conduct comported with the terms of the agreement," the covenant required that the franchisor "not franchise a second store in [the franchisee's] market area." Super Valu Stores, Inc. v. D-Mart Food Stores, Inc., 146 Wis. 2d 568, 577, 431 N.W.2d 721 (Ct. App. 1988). In Super Valu Stores, the franchise agreement "specifically authorized" the franchisor to act in a manner which could harm the franchisee. The franchise agreement explicitly stated that the franchise was non-exclusive and the franchisor had the "sole choice and discretion" as to whether to enter another franchise agreement in the same community or any other. Id. at 572. As the court of appeals said in that case,

19

> [W]here, as here, a contracting party complains of acts of the other party which are specifically authorized in their agreement, we do not see how there can be any breach of the covenant of good faith. Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a "bad faith" breach of that contract.

Id. at 577. Unlike in Chayka, in Super Valu Stores there was compliance with both the form and substance of the contract.

¶30 Having determined that specific performance is available and warranted by a substantial enough breach by a party, the court arrives at the heart of the matter——the "balancing of the equities" in which it takes into consideration all the facts and circumstances and determines whether the plaintiff is entitled to the equitable relief he seeks. "The fairness of ordering specific performance depends on the facts and equities of the individual case before the circuit court and will vary from case to case." Ash Park, 324 Wis. 2d 703, ¶38. This balancing has been described as "a judicial discretion":

> But this discretion is not one to be exercised at the mere will and pleasure of the judge. It must be a judicial discretion, controlled and governed by the principles and rules of equity. Its exercise therefore depends upon the existence of a multitude of facts, events, and incidents surrounding the transaction . . . .

Mulligan v. Albertz, 103 Wis. 140, 144, 78 N.W. 1093 (1899). "Accordingly, specific performance will be granted when it is apparent from a view of all the circumstances of the particular case that it will serve the ends of justice." 81A C.J.S. Specific Performance § 4 (2004). Indeed, as one treatise has stated, "[I]n determining the question [of whether to grant or

20

refuse a decree of specific performance], a greater variety of facts is to be taken into consideration than is the case in an action for damages for breach of contract." 12 Joseph M. Perillo, Corbin on Contracts § 63.1 (rev. ed. 2012).

¶31 As a part of its equitable balancing, the court must consider countervailing concerns: Are there any factual considerations that would make specific performance unfair, unreasonable, impossible, oppressive, harsh or unjust? See Gaugert v. Duve, 2001 WI 83, ¶47, 244 Wis. 2d 691, 628 N.W.2d 861 (stating, "The circuit court's analysis did not reveal any factual considerations that would make specific performance unfair, unreasonable, or impossible." (citing Anderson v. Onsager, 155 Wis. 2d 504 at 512-13, 455 N.W.2d 885 (1990))). This determination has been phrased in various ways: "The court will not grant the relief unless satisfied that the claim is fair and the contract equal and founded on consideration, that it is not opposed to public policy, that the plaintiff is guilty of no inequitable conduct or of delay constituting laches, and that the result will not be oppressive, harsh or unjust." 9 Jay Grenig, Wisconsin Pleading and Practice § 81:2 (5th ed. 2012) (citing cases).

¶32 Consistent with the latitude the circuit court has to consider many factors is the latitude the circuit court has to fashion a remedy. Wisconsin cases have recognized that once a court has determined that equitable relief is appropriate, it has wide latitude to fashion the remedy based on the equities of the case. "This being an action for specific performance the

circuit court sits as a court of equity and should be able to fashion relief which will be equitable to both plaintiffs and defendants." Venisek v. Draski, 35 Wis. 2d 38, 51, 150 N.W.2d 347 (1967). See also Town of Fond du Lac v. City of Fond du Lac, 22 Wis. 2d 525, 531-32, 126 N.W.2d 206 (1964) ("A court of equity has inherent power to fashion a remedy to the particular facts. Continued failure to do so would render equity . . . sterile and . . . arbitrary in its relief . . . ."); Am. Med. Servs., Inc. v. Mut. Fed. Sav. & Loan Ass'n, 52 Wis. 2d 198, 205, 188 N.W.2d 529 (1971) ("The court of equity has always had a traditional power to adapt its remedies to the exigencies and the needs of the case; that was one of the great virtues and reasons for the existence of courts of equity."); Ash Park, 324 Wis. 2d 703, ¶73 ("[T]he court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties." (quoting 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 109 (5th ed. 1941)).

¶33 Finally, we note that this case arises in the posture of a summary judgment motion. We review a summary decision de novo, applying the same methodology as the circuit court. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). "Under [Wis. Stat. § 802.08], summary judgment must be entered 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

22

judgment as a matter of law.'" Swatek v. County of Dane, 192 Wis. 2d 47, 61, 531 N.W.2d 45 (1995). The methodology is straightforward——evaluate the claim first, then see if the moving party has presented a prima facie case for summary judgment, and if so, examine the opposing party's proof:

> Our first step is to discern whether the pleadings set forth a claim for relief as well as a material issue of fact. If the pleadings meet this initial test, our inquiry shifts to the moving party's affidavits or other proof to determine whether a prima facie case for summary judgment has been presented. If the moving party has made a prima facie case for summary judgment, we then examine the affidavits and other proof of the opposing party to discern whether there exist disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial.

Id. at 61-62.

### III. DISCUSSION

¶34 Having set out the analytical framework that applies to a specific performance case, we now turn to the task of applying it to the case at hand. We apply the methodology as described by Swatek. There is no dispute, as to the initial question, that the pleadings set forth a claim for relief, specifically for equitable relief, pursuant to a contractual provision, as well as a material issue of fact. The amended complaint alleges that Sideline failed to pay the stipulated price after Beidel exercised his put option.

¶35 The next question is whether the moving party, in this case Sideline, has made a prima facie case for summary judgment. "To make a prima facie case for summary judgment, a moving

23

defendant must show a defense which would defeat the plaintiff." Grams v. Boss, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980), overruled on other grounds by Meyers v. Bayer AG, Bayer Corp., 2007 WI 99, 303 Wis. 2d 295, 735 N.W.2d 448.

¶36  In order to prevail on his equitable claim, as we have set forth above, Beidel would have to show that that specific performance is available to him as a remedy,[21] that there was a substantial enough breach to warrant specific performance, that the equities lie on his side, and that nothing would make an order of specific performance unfair, unreasonable or impossible. In order to make a prima facie case for summary judgment, Sideline must therefore show "a defense which would defeat the plaintiff." Grams, 97 Wis. 2d at 338. In the context of a specific performance claim, the motion for summary judgment must address the specific requirements the case law sets forth for such a claim.

### A.   The Summary Judgment Motion

¶37 An examination of Sideline's summary judgment motion shows that while it has shown a defense which would defeat a constructive termination argument in a wrongful termination claim, it has not shown a defense which would defeat the claim

---

[21] In the Agreement, the parties stipulated that "[i]f a controversy arises concerning the right or obligation to purchase or sell any of the shares of Stock, such right or obligation shall be enforceable in a court of equity by a decree of specific performance." When a contract specifies remedies available for breach of contract, the intention of the parties generally governs. Ash Park, 324 Wis. 2d 703, ¶37.

Beidel actually brought. Not only does the summary judgment motion fail to address the equitable claim directly, it attempts to support its position with facts and arguments that could be construed to support Beidel's position on the equitable claim (e.g., Sideline claims that it had a "right to postpone the termination, in order to avoid the stipulated price," that Hall "was not motivated to coerce Beidel into resigning in advance of March 2009," and that Hall "was motivated" to keep him employed "until at least after the stipulated price expired"). None of these assertions are inconsistent with Beidel's theory that Sideline unfairly refused to purchase his shares at the stipulated price after delaying his termination for that express purpose. Because the summary judgment motion does not show a defense that would defeat the equitable claim, it does not make a prima facie case. The analysis ends there, and the motion fails.

¶38 We turn next to the two legal concepts that are likely to arise again when the case is remanded: the doctrine of constructive termination and the covenant of good faith and fair dealing. We examine each of the issues in order to acknowledge and respond to the parties' arguments.

## B. Constructive Termination

¶39 As noted above, Beidel was formally terminated by the board of Sideline in September 2009. He has asserted that he was, in reality, terminated long before that. The significance of the timing is that if the termination took place while the stipulated price was still in effect, Beidel's shares are worth

$1,600 each. If the termination took place after the expiration of the stipulated price, his shares are worth many times less.

¶40 The constructive discharge doctrine "recognizes that some resignations are coerced, tantamount to a termination." Strozinsky v. Sch. Dist. of Brown Deer, 2000 WI 97, ¶68, 237 Wis. 2d 19, 614 N.W.2d 443. We addressed this scenario in Strozinsky and described the purpose of the doctrine this way:

> Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment.

Strozinsky, 237 Wis. 2d 19, ¶68.

¶41 The court stated that the significance of the holding was that "employers cannot escape liability by coercing a resignation instead of formally uttering the words 'you're fired.'" Id., ¶83. It then stated what a plaintiff seeking to establish that a resignation was coerced must show: "The plaintiff must prevail under an objective standard, establishing that conditions were so intolerable that a reasonable person confronted with same circumstances would have been compelled to resign." Id.

¶42 Beidel asserts that the situation here is governed by the principle underlying the constructive discharge doctrine—

26

that substance is more important than form. Essentially, he seeks, at least in the context of an equitable claim, an interpretation of the constructive discharge test under which the meaning of being "substantially terminated" would encompass situations where an employer does not formally terminate an employee, and the employee does not resign. He has not, however, brought to our attention any cases in which a court found constructive termination had occurred where the employee had not resigned. Sideline agrees that the doctrine is key in this case; indeed, it asserts that the dispositive question in this case is whether Beidel can show that he was constructively discharged prior to the expiration of the stipulated price of the shares. Sideline argues that Beidel concedes that his formal termination happened later, and he cannot show that he resigned, as required by the Strozinsky elements. Sideline asserts that those facts are fatal to his claim that the put option was triggered before the stipulated price expired.

¶43 We disagree in key respects with both approaches. Beidel is wrong because he thinks in an equitable case, the test for constructive discharge can be applied in a less formalistic way such that constructive discharge can be found to occur even where there is not a resignation by an employee. Even though the rationale underlying the constructive discharge doctrine is, as Beidel points out, one of making sure that "substance prevails

27

over form," courts have established the test for a constructive termination, and every Wisconsin case we have found that meets that test involves a resignation. See Strozinsky, 237 Wis. 2d 19, ¶68. The fact that the test was developed in order to help courts do justice does not mean that it is to be applied without regard to the required elements. We see no need to alter the Strozinsky approach to testing constructive discharge claims. We recognize that this case is unusual in that it involves an employee who is also a shareholder and director, who is arguably compelled by his own self-interest to help keep the company functioning and profitable and therefore prevented from resigning as might an employee without those additional roles. We do not think it wise to alter an established and workable test to fit the unusual situation presented here.

¶44 However, we cannot agree that this conclusion——that the constructive termination test is not satisfied——disposes of Beidel's equitable claim. Sideline argues that specific performance of the contract is precluded because the constructive termination elements cannot be shown. But that argument is based on a fundamental misapprehension of the claim for specific performance: Beidel was not pursuing a claim for wrongful termination and does not allege that the termination of his employment, whenever it happened, violated any contract. As the court of appeals held, the analysis does not end with the

28

disposal of the constructive termination claim. Further, it is unhelpful and unnecessary to graft the constructive termination requirements onto the equitable analysis. On that point, we agree with Beidel that "[t]he court's discretion in deciding whether to grant specific performance should not be limited by a test imported from an entirely different legal theory implicating entirely different concerns."

¶45 There is one further, related consideration, given that Beidel's claim turns on the timing of the ending of his employment with Sideline. The foundation for Beidel's specific performance claim is that his treatment by Sideline triggered his right to exercise his put option prior to the expiration of the stipulated share price. The contract, in section 6, "Termination of Employment Without Cause; Shareholder's Put Option," cross-references section 7(b) for the definition of "Cause":

> "Cause" means (i) the commission of a felony or a crime involving moral turpitude or the commission of any other act or omission involving dishonesty, disloyalty or fraud with respect to Sideline, (ii) failure to devote his entire business time to the business of Sideline (subject to normal vacation leave or time off, illness or sick leave, or other periods of permitted absence), (iii) conduct tending to bring Sideline into substantial public disgrace or disrepute, (iv) gross negligence or willful misconduct with respect to Sideline, or (v) any material breach of this Agreement.

29

However, we observe that the contract does not define "termination."[22] In the course of weighing the equities in a specific performance claim based on a contract, a court needs to of course consider the terms of the contract, and whether "termination" is ambiguous, and if so, what the parties intended the term to mean.[23] All of this is appropriate to consider when the circuit court weighs the equities involved.

### C. Covenant of Good Faith and Fair Dealing

¶46 The parties also dispute the application of the covenant of good faith and fair dealing in the context of a

---

[22] We briefly note again the language in Section 6 concerning what triggers the obligation of Sideline to purchase the shareholder's stock at the price in effect at the relevant time:

> Termination of Employment Without Cause; Shareholder's Put Option. Upon the termination of a Shareholder's employment with Sideline without cause (as defined in section 7(b) below), the terminated Shareholder shall have a continuing option to sell all or any part of the Stock owned by him, and upon exercise of such option, Sideline shall have the obligation to purchase all of Shareholder's Stock so elected for sale by such Shareholder, at the price and on the terms provided in sections 8 and 9 below.

[23] Capital Investments, Inc. v. Whitehall Packing Co., 91 Wis. 2d 178, 190, 280 N.W.2d 254 (1979) ("After a contract has been found to be ambiguous, it is the duty of the courts to determine the intent of the parties at the time the agreement was entered into. In resolving the ambiguity and determining the parties' intent, the court may look beyond the face of the contract and consider extrinsic evidence. Additionally, the court may rely on the canons of construction which are designed to ascertain the intentions of the parties entering into a contract." (Citations omitted.)).

30

specific performance claim, especially one that involves an employee's termination. We set out above the basic principles that Wisconsin cases have discussed: that every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties; that a violation of the implied promise of good-faith dealing may be considered independent of any breach of the underlying contract; and that the covenant cannot be used to turn what was specifically authorized in the agreement into a breach.[24]

¶47 Sideline makes several arguments related to this topic. It argues that Beidel waived the opportunity to have this doctrine discussed in connection with his claim, and it appears to take the position that it is not appropriate or permitted for the court to consider the application of the covenant of good faith and fair dealing unless Beidel "pled a second cause of action that is independent and severable from the claim for breach of contract based upon constructive

---

[24] See discussion at ¶¶27-29, supra. Contrary to the dissent's claim (Dissent, ¶5), we do not conclude that the covenant of good faith and fair dealing can "be used to vitiate clear contractual language."

31

discharge."[25] Sideline also argues that there is no application of the covenant of good faith and fair dealing because the covenant is employed as a "gap-filler," to be applied to circumstances that are not contemplated by the language of the parties' contract. In this case, Sideline asserts, the contract has no gaps to fill because the Stock Repurchase Agreement contemplated that Sideline "might [choose] to make the termination effective after the stipulated price expired because of changes in market conditions or other uncertainties impacting the accuracy of the stipulated price." Finally, it asserts that to the extent that the covenant of good faith and fair dealing comes into play here, it was Beidel who breached the duty of good faith by seeking to obtain a premium for his shares to which he was not entitled under the terms of the contract. Beidel argues that the covenant of good faith and fair dealing is applicable in the analysis of an equitable claim and asserts that because it is a part of all contracts, there has been no waiver of its application here.

¶48 Sideline's waiver argument is not persuasive. It would be absurd to remand for the balancing of the equities

---

[25] We would note that Beidel's claim is pled as an equitable claim. The complaint lists three claims, characterized as follows: Count I: Specific performance (as to Sideline Software, Inc.), Count II: Breach of fiduciary duty (as to Michael C. Hall) and Count III: Breach of fiduciary duty (as to Kevin C. Austin).

where a party seeks specific performance and to do so on the condition that the circuit court ignore breaches of good faith and fair dealing by the parties. While the covenant of good faith and fair dealing is implicit in all contracts and thus relevant to all types of contract claims, it is most relevant in an equitable case, which by its nature deals with the ideal of fairness. There is no requirement that a claim be pled as a breach of the covenant of good faith and fair dealing in order for the doctrine to play a part in the analysis of the case. As discussed above at paragraph 29, the situation in Super Valu Stores was one in which the franchisee countersued the franchisor on the grounds that the franchisor's decision to grant another franchise in the same city violated the duty of good faith and fair dealing "even if [the franchisor's] conduct comported with the terms of the agreement." Super Valu Stores, 146 Wis. 2d at 577. In that case, the contract explicitly permitted the franchisor to act to the detriment of the franchisee: The franchise agreement explicitly stated that the franchise was non-exclusive and gave the franchisor "the right . . . to enter into . . . Retailer Agreements with other parties at [its] sole choice and discretion." Id. at 572. Entering into retailer agreements with other parties, therefore, did not constitute a lack of good faith and fair dealing because the franchisee had consented to it in the contract. Whether

33

Sideline's alleged action was "contemplated by the plain language of the parties' contract," as the franchisor's right in Super Valu Stores was, will be a matter for the circuit court to decide. Sideline's and Beidel's remaining arguments about the application of good faith and fair dealing may also be appropriately directed to the circuit court on remand.[26]

## IV. CONCLUSION

¶49 We reiterate that the case law on specific performance is abundantly clear that the equities must be weighed. It is clear from a review of the record that such a balancing has never happened in this case. The motion for summary judgment

---

[26] The standard jury instruction on the implied duty of good faith, Wis JI-Civil 3044, may be of assistance. It states in part:

> Under Wisconsin law, the contract between (defendant) and (plaintiff) requires that each party act in good faith towards the other party and deal fairly with that party when (performing) (enforcing) (carrying out) the expressed terms of the contract. This requirement to act in good faith is a part of the contract just as though the contract stated it. . . . Whether the duty to act in good faith has been met in this case should be determined by deciding what the contractual expectations of the parties were. Therefore, in deciding whether the defendant breached the duty of good faith by (e.g., terminating the contract . . . ), you should determine the purpose of the agreement; that is, the benefits the parties expected at the time the agreement was made. This duty of good faith means that each party to a contract will not do something which will have the effect of injuring or destroying the (rights) (ability) of the other party to receive the benefits of the contract.

34

failed to make a prima facie case that Sideline was entitled to specific performance because it did not show a defense that would defeat the equitable claim it opposed.

¶50 We therefore agree with the court of appeals that summary judgment was improperly granted in this case without the required balancing of the equities that are due to a specific performance claim and without a consideration of the possibility of a breach of the covenant of good faith and fair dealing. In order to make a prima facie case that Sideline was entitled to summary judgment, its motion would need to show a defense that would defeat Beidel's claim. That is, it must successfully attack the requirements for obtaining specific performance:

- that specific performance is available as a remedy;

- that there has been a substantial enough breach to warrant specific performance; and

- that the equities lie on his side, and that nothing would make an order of specific performance unfair, unreasonable or impossible.

In determining whether the requirements for specific performance have been met in this case, it will be necessary for the court to interpret and apply the provisions of the Stock Repurchase Agreement, with special reference to Section 6, Termination of Employment without Cause, as well as Sections 8(b) and (c), which relate to valuation. In this case the analysis

necessarily involves interpreting the contract and determining whether the undefined term "termination" is ambiguous, and if so, what the parties intended the term to mean. Extrinsic evidence may be needed in order to make the determination of the parties' intent.

¶51 Sideline's motion for summary judgment does not set forth such a defense, and therefore fails to make a prima facie case. Accordingly, we affirm the court of appeals and remand for "the circuit court's determination where the bulk of the equities lie, including an evaluation of what the parties intended when they agreed to the stock re-purchase agreement, and whether it should grant specific performance as Beidel requested." Beidel, 340 Wis. 2d 433, ¶16. A circuit court may grant summary judgment to a party on remand as warranted after the equities have been balanced, recognizing the implications of the nature of a claim for specific performance and the well-established obligation of good faith and fair dealing.

*By the Court.*—The decision of the Court of Appeals is affirmed.

DAVID T. PROSSER, J., did not participate.

¶52 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I concur and join the majority opinion's discussion concerning termination which is consistent with this concurrence and the majority's conclusion that the question of when Beidel was terminated should proceed before the trial court. I agree that this case should be remanded because the facts need development as to when a "termination" occurred under the terms of the Stock Repurchase Agreement such that the proper remedy can be determined. Here, the remedy hinges upon when the termination occurred. Based on the record before the court, it is unclear whether Beidel is entitled to the stipulated price of $1,600 per share or the lower fair market value price.

¶53 As this case is a matter of contract interpretation, I repeat the relevant contract language. Section 6 of the Stock Repurchase Agreement governs when a shareholder who is terminated without cause is entitled to the stipulated stock price:

> <u>Shareholder's Put Option</u>. Upon the termination of a Shareholder's employment with Sideline without Cause (as defined in section 7(b) below), the terminated Shareholder shall have a continuing option to sell all or any part of the Stock owned by him, and upon exercise of such option, Sideline shall have the obligation to purchase all of Shareholder's Stock so elected for sale by such Shareholder, at the price and on the terms provided in sections 8 and 9 below. . . . The terminated Shareholder shall exercise such option by providing 30 day[s'] prior written notice to Sideline of his decision to sell his Stock.

1

Sideline does not allege that Beidel was terminated for cause. Its brief states that "Beidel was terminated as an officer and employee."

¶54 Section 8 of the contract governs the initial per share price and how the price would be determined thereafter, including an annual review of the price. "Upon such review, the Shareholders and Sideline shall either stipulate by an instrument in writing that there is no change in the price last stipulated or agree upon a new Purchase Price by an instrument in writing signed by them and Sideline . . . ." If the parties did not negotiate a new price, the prior year's price continued for one more year, such that a stipulated price could stay in effect for a maximum of two years. If the parties still did not negotiate a price two years after the last stipulated price, the price of shares that were sold "shall be the fair market value of the Stock as determined by an appraiser selected by Sideline." The most recent stipulated price of $1,600 per share was entered into on March 6, 2007, and it was set to expire on March 6, 2009.

¶55 The threshold question that the circuit court must consider is whether Beidel was "terminated" before March 6, 2009, as that term is used in the contract. If he was, then he is entitled to the stipulated price of $1,600 per share. If he was not, then he is entitled to a per share price determined by the fair market value.[1]

---

[1] The majority opinion agrees this is a question to be resolved on remand. See majority op., ¶¶44, 45, 46 n.24.

2

¶56 The goal of contract interpretation is to ascertain the intent of the parties. Kernz v. J.L. French Corp., 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751. When the contract is plain and unambiguous, "we will construe the contract as it stands." Id. (citation omitted). Under the contract language and its call for specific performance as the remedy, when Beidel was terminated is the central issue.

¶57 The Stock Repurchase Agreement does not define "termination." Black's Law Dictionary defines "termination" as "[t]he act of ending something." Black's Law Dictionary 1482 (7th ed. 1999). Another dictionary defines "termination" as "[t]he act of terminating or the condition of being terminated." The American Heritage Dictionary of the English Language 1852 (3d ed. 1992).

¶58 Sideline argues that Beidel was formally terminated by the board of directors on September 17, 2009. Beidel argues that he was terminated before the March 6, 2009, expiration of the stipulated price. He points to the fact that in October 2008, Sideline informed him that it intended to fire him and in January 2009, transitioned his duties to other employees. See majority op., ¶17. On January 20, 2009, pursuant to Section 6 of the contract, Beidel submitted written notice purportedly to exercise his put option. Id.

¶59 One reasonable interpretation of the word "termination" in the Stock Repurchase Agreement is a complete separation or a complete end to the shareholder's employment. Another reasonable interpretation of "termination" is an act

3

evidencing an employer's intent to end the shareholder's employment. In this case, Sideline reduced Beidel's employment duties significantly and admitted to running out the clock on the stipulated price. Whether that reduction in duties constitutes a termination under the terms of the agreement is a question of fact that is not resolved by the language of the contract or by the record before the court. Cf. Loos v. George Walter Brewing Co., 145 Wis. 1, 4, 129 N.W. 645 (1911) (stating that when employer does not permit employee to perform "the substantial or principal service he agreed to perform" and directs the employee to perform other tasks, an employee who refuses to complete new tasks "may treat such refusal and direction as a discharge"); 1A Steven Plitt, Daniel Maldonada & Joshua D. Rogers, Couch on Insurance § 8:68 (3d ed. 2010) ("The employee's performance of administrative functions in relation to the insured does not conclusively extend the employment."). The word "termination" in the Stock Repurchase Agreement is subject to more than one reasonable interpretation and the facts in the record do not conclusively answer what the parties intended by "termination." Justice Gableman asserts that the parties stipulated to the time period of the termination. See dissent, ¶67 n.2. The record in that regard is not crystal clear because the record does not contain a copy of the actual stipulation.[2] Therefore, I would remand this case for a hearing

---

[2] Not only does the record not contain a firsthand copy of the actual stipulation, but the secondhand information we do have in the record is unclear as to the nature of the stipulation. The attorneys give two different portrayals of what was stipulated. Sideline's attorney stated that "we've had

before the circuit court to determine when the termination occurred.

¶60 The majority opinion remands this case for "the circuit court's determination where the bulk of the equities lie, including an evaluation of what the parties intended when they agreed to the stock re-purchase agreement, and whether it should grant specific performance as Beidel requested." Majority op., ¶51. The majority's approach of balancing the equities should not be read to preclude summary judgment when applying the terms of the contract.

¶61 I agree that unnecessarily injecting good faith and fair dealing into a contract, especially when the terms of the contract are clear, is improper. See dissent, ¶69. Indeed, the Seventh Circuit is rightly wary of using the doctrine of good faith and fair dealing to overcome the rights and responsibilities set forth in a contract. See id., ¶72 (quoting Mkt. St. Assocs. Ltd. P'ship v. Frey, 941 F.2d 588, 593, 595 (7th Cir. 1991) ("[I]t is unlikely that Wisconsin wishes, in the name of good faith, to make every contract signatory his brother's keeper. . . . It would be quixotic as well as presumptuous for judges to undertake through contract law to raise the ethical standards of the nation's business people.")).

---

a concession by the plaintiff that there was no actual termination." Beidel's attorney stated that "we did agree and stipulate that we would not pursue that," meaning the actual termination claim. As I do not believe the record before this court conclusively resolves whether Beidel was terminated under the terms of the contract, I would remand.

5

¶62 Here, the critical contract term, "termination," is not fully developed within the facts of this case, the meaning of which must be determined on remand. Therefore, I would remand for a circuit court hearing to determine when the termination occurred. If the fact finder concludes Beidel was not "terminated" prior to March 6, 2009, he will receive only the fair market value of his shares. If the fact-finder's decision is to the contrary, the contract sets the per share price he is to be paid.

¶63 For the foregoing reasons, I respectfully concur.

¶64 I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

¶65 MICHAEL J. GABLEMAN, J. *(dissenting).* Today the court undermines contract rights in the name of good faith and fair dealing, overturns thirty years of precedent, and inverts the employer-employee relationship. I respectfully dissent.

### I. BEIDEL FORFEITED HIS ARGUMENT CONCERNING THE COVENANT OF GOOD FAITH AND FAIR DEALING

¶66 Before discussing the majority's legal conclusions, it is important to first note that Beidel forfeited[1] his argument that Sideline violated the covenant of good faith and fair dealing. Beidel never pled a claim related to the covenant of good faith and fair dealing, nor did he raise the issue before the court of appeals. The court of appeals, however, assisted Beidel by plucking the remedy out of thin air and making it the basis for its decision to remand to the circuit court to determine "where the bulk of the equities lie." Beidel v. Sideline Software, Inc., 2012 WI App 36, ¶16, 340 Wis. 2d 433, 811 N.W.2d 856.

¶67 So how does the majority get around the forfeiture obstacle? By stating that "[i]t would be absurd to remand for the balancing of the equities where a party seeks specific performance and to do so on the condition that the circuit court ignore breaches of good faith and fair dealing by the parties."

---

[1] The majority refers to Beidel "waiving" his argument but "forfeiture" is the more accurate term. See State v. Ndina, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612 ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (citation omitted).

1

Majority op., ¶48. But this puts the cart before the horse. Given that the majority is holding that the constructive discharge doctrine does not apply, and that constructive discharge was the entire justification for Beidel's specific performance claim, it is unclear why this court is not dismissing Beidel's complaint and is instead ordering the circuit court to consider a claim that was never pled.[2]

---

[2] The concurrence considers a remand appropriate for further fact-finding on whether Beidel was actually terminated during the relevant time period. Concurrence, ¶59 n.2. I read the record differently. In my view, Beidel conceded that he was not actually terminated within the relevant period and a hearing on the issue is therefore unnecessary.

At a telephonic conference regarding Beidel's motion for reconsideration, Sideline's attorney stated: "I think we've had a concession by [Beidel] that there was no actual termination of him by Sideline . . . . [B]ecause of that prior concession by [Beidel], I would like to prepare the order [dismissing Beidel's motion for reconsideration]." Beidel's attorney then asked Sideline's attorney to "send it to me before you send it in. We'll make sure it's in the right form before we even get it to the judge." The following month the circuit court signed the order denying Beidel's motion for reconsideration. The order contained the following language: "Further, based on an agreement of the parties placed on the record on January 27, 2011, that Plaintiff [Beidel] does not contend he was actually terminated by Sideline prior to March 7, 2009, this Order resolves all claims as to Sideline's alleged liability to Plaintiff." No party ever objected to this language, and no party objects to it now.

¶68 While I acknowledge that appellate courts have the inherent authority to consider issues raised for the first time on appeal, State v. Huebner, 2000 WI 59, ¶¶27-28, 235 Wis. 2d 486, 611 N.W.2d 727, this discretionary power should be used sparingly. Green v. Hahn, 2004 WI App 214, ¶21, 277 Wis. 2d 473, 689 N.W.2d 657. Moreover, our forfeiture doctrine permits us to consider issues or arguments not raised; it does not extend to causes of action that were never pled. Sohns v. Jensen, 11 Wis. 2d 449, 458, 105 N.W.2d 818 (1960) ("Where an issue is neither pleaded nor litigated in the trial court, this court ordinarily will not consider it on appeal . . . ."); Murphy v. Martin, 58 Wis. 276, 280, 16 N.W. 603 (1883) (noting that it is not the "province of this court" to "form new issues"). As we recently stated, "The mutual consolation of forfeiture is that each party can be confident that a right forfeited by the other will not be relitigated in some subsequent appeal or proceeding." State v. Soto, 2012 WI 93,

---

I regard the exchange between the attorneys quoted above as an oral stipulation, subsequently memorialized in the court's order, and binding on the litigants. See, e.g., Wyandotte Chemicals Corp. v. Royal Elec. Mfg. Co., Inc., 66 Wis. 2d 577, 589, 225 N.W.2d 648 (1975) ("Generally then, oral stipulations made in open court, taken down by the reporter, and acted upon by the parties and the court are valid and binding.") (citation omitted). In my opinion, the doctrine of claim preclusion would thus bar Beidel from making an argument that he was actually terminated under the hearing envisioned by the concurrence. See N. States Power Co. v. Bugher, 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995) (describing the elements of claim preclusion as: "(1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and (3) a final judgment on the merits in a court of competent jurisdiction.").

3

¶36, 343 Wis. 2d 43, 817 N.W.2d 848. Or as Justice Scalia has put it, the purpose of applying the forfeiture rule is to ensure that the trial remains "the main event," and not simply a "tryout on the road to appellate review." Freytag v. Comm'r of Internal Revenue, 501 U.S. 868, 895 (1991) (Scalia, J., concurring). The court today provides no justification for ignoring the forfeiture rule and giving Beidel——a sophisticated party who has been ably represented throughout this litigation—— a shot at a second trial. In this respect the majority——much like the court of appeals before it——serves as advocate rather than adjudicator.

## II. THE COVENANT CANNOT OVERRIDE EXPRESS TERMS OF A CONTRACT

¶69 The most important fact in this case is that Sideline acted completely in accordance with its contractual rights. While it is true that the covenant of good faith and fair dealing inheres in every contract, this equitable doctrine cannot, contra the majority, be used to vitiate clear contractual language. Instead, the notion of good faith is meant to serve as a gap-filler where a contract is silent. United States v. Basin Elec. Power Coop., 248 F.3d 781, 796 (8th Cir. 2001). It may not "block use of terms that actually appear in the contract," and it has "nothing to do with the enforcement of terms actually negotiated." Continental Bank, N.A. v. Everett, 964 F.2d 701, 705 (7th Cir. 1992) (Easterbrook, J.) (citation omitted). Indeed, in a recent decision the United States Supreme Court unanimously held that equitable remedies

4

cannot trump the plain terms of a contract and may be used only to fill contractual gaps. US Airways, Inc. v. McCutchen, 569 U.S. __, 133 S. Ct. 1537, 1546-47, 1549-50 (2013). Here, there are simply no gaps to be filled.

¶70 The majority seems to recognize these principles when it states that "[a] party may not, however, employ the good faith and fair dealing covenant to undo express terms of an agreement." Majority op., ¶29. In fact, the majority quotes (but then ignores) the following language from a court of appeals opinion:

> [When] a contracting party complains of acts of the other party which are specifically authorized in their agreement, we do not see how there can be any breach of the covenant of good faith. Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a "bad faith" breach of that contract.

Super Valu Stores, Inc. v. D-Mart Food Stores, Inc., 146 Wis. 2d 568, 577, 431 N.W.2d 721 (Ct. App. 1988). The majority's knowing disregard of such a fundamental principle of contract law is inexplicable. It appears that the majority either thinks that the concept of good faith and fair dealing is much broader than it is, or perhaps it wants to expand the doctrine with this case. In any event, the doctrine of good faith and fair dealing is plainly inapplicable when a scenario is covered by the terms of a contract.

¶71 Two of the leading lights of the law and economics movement, Judges Frank Easterbrook and Richard Posner of the United States Court of Appeals for the Seventh Circuit, have sharply criticized the idea—advanced by the majority—that a

5

party's bargained for contractual rights can be superseded by the ethereal good faith requirement. As Judge Easterbrook has said, "Parties to a contract are not each others' fiduciaries; they are not bound to treat customers with the same consideration reserved for their families." Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990). An individual is "entitled to enforce [a contract] to the letter," even if this causes "great discomfort" to the other party. Id. The essence of an at-will contract is that an "employer may sack its employee for any reason except one forbidden by law, and it need not show 'good cause.'" Id. at 1358.

¶72 In a similar vein, Judge Posner——in a decision interpreting Wisconsin law——wrote that "it is unlikely that Wisconsin wishes, in the name of good faith, to make every contract signatory his brother's keeper. . . . In fact the law contemplates that people frequently will take advantage of the ignorance of those with whom they contract, without thereby incurring liability." Market Street Assocs. v. Frey, 941 F.2d 588, 593-94 (7th Cir. 1991). What is more, "even after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain." Id. at 594. Judge Posner warned that "[i]t would be quixotic as well as presumptuous for judges to undertake through contract law to raise the ethical standards of the nation's business people." Id. at 595. Living in a free enterprise society means that we

must accept that some contracts may "place one party at the other's mercy." Id.

¶73 When Beidel and Hall entered into the stock repurchase agreement, both knew (or should have known) that the put option would be subject to the whims of the marketplace. For some reason, the majority has decided to immunize Beidel and punish Hall for the bargain that each struck. In doing so, this court has just loosed a great deal of uncertainty upon contract law in the State of Wisconsin, and in the process inverted the employer-employee relationship by ceding some of a company's termination authority to its workers. At the very least, an at-will employee can now raise a colorable claim on the meager basis that he was terminated at a time inconvenient for him and his stock options. This court would do well to heed the words of Judge Learned Hand: "[I]n commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." James Baird Co. v. Gimbel Bros., Inc., 64 F.2d 344, 346 (2d Cir. 1933).

### III. THE MAJORITY OVERTURNS A THIRTY-YEAR-OLD DECISION OF THIS COURT

¶74 In deciding that Beidel can present a factual argument that the timing of his firing was in bad faith, this decision overturns, sub silentio, Brockmeyer v. Dun & Bradstreet, 113 Wis. 2d 561, 335 N.W.2d 834 (1983), a case not even mentioned by the majority. There, Brockmeyer was fired for smoking marijuana in front of his employees, poor job performance, and having an affair with his secretary. Id. at 565. Despite having no

7

employment contract, Brockmeyer filed a wrongful discharge action. Id. at 564-65. The issue in the case was whether an at-will employee could bring a wrongful discharge action. See id. at 563.

¶75 We began by recognizing the American common law rule, which was that an employer may discharge an at-will employee "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong." Id. at 567 (citations omitted). We then noted that federal and state statutes have since modified the concept of an at-will employee such that certain protected classes cannot be fired for discriminatory reasons. Id. at 567-68. Consistent with these statutory trends, state courts across the country developed two common law causes of action for terminated at-will employees. Id. at 568. One is the "public policy exception," which allows a discharged employee to recover if "the termination violates a well-established and important public policy." Id. at 569. The other cause of action is broader, and provides that an employer has an implied duty to terminate an employee only in good faith. Id. A discharge in bad faith would thus constitute a breach of contract. Id.

¶76 This court adopted the public policy exception while expressly rejecting the bad faith termination cause of action. As we stated, "We refuse to impose a duty to terminate in good faith into employment contracts. To do so would 'subject each discharge to judicial incursions into the amorphous concept of bad faith.' . . . Imposing a good faith duty to terminate would

8

unduly restrict an employer's discretion in managing the workforce." Id. (citation omitted). That has been the law for thirty years. With today's decision that Sideline is not entitled to summary judgment for exercising a clear contractual right because the timing of Beidel's termination may have been in bad faith, the majority overrules Brockmeyer and erodes at-will employment contracts.

IV. THE RECORD DOES NOT SUPPORT A FINDING OF BAD FAITH

¶77 Finally, if this court is going to adopt the bad faith termination cause of action, it is worth pausing to consider whether Sideline actually acted in bad faith towards Beidel. Our decision remands this case to the circuit court to determine which party has a stronger equitable claim. As I have made clear throughout this dissent, I am unsure when it would ever be inequitable for a party to exercise a valid contractual right, so I do not know how the circuit court is supposed to proceed under the standard crafted by today's opinion. But be that as it may, I can see nothing that could plausibly be characterized as bad faith conduct on the part of Sideline.

¶78 In October 2008, Hall informed Beidel that he planned to fire him the following March, after Sideline's stock could be revalued from its overinflated price of $1,600 a share. In doing so, Hall acted not only in his best interests, but in the best interests of the company as well. Additionally, by providing notice to Beidel when he did, Hall gave him five months to prepare for the inevitable. And during the period leading up to his termination, Beidel continued to receive

9

compensation from Sideline——to the tune of $269,000 in salary and shareholder distributions in 2008.

¶79 The only options Sideline had, besides the one it took, were: (1) act contrary to its own interests and terminate Beidel when the stock was overvalued; or (2) keep mum about Beidel's impending termination and instead spring the news on him the day after Sideline's stock was revalued. The first choice is irrational and the second would seemingly fail the equitable test laid down by the majority, but if Sideline is not able to rely on the language of the contract, those were its only alternatives. The court is remanding this case for the circuit court to determine "whether the equities lie on the plaintiff's or defendant's side," majority op., ¶1, but I think today's decision has already stacked the deck against Sideline.

¶80 For the foregoing reasons, I respectfully dissent.